Filed 1/21/20

<u>**CERTIFIED FOR PARTIAL PUBLICATION**</u>[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| NOLTE SHEET METAL, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> OCCUPATIONAL SAFETY AND HEALTH APPEALS BOARD, <br><br> Defendant and Respondent; <br><br> DEPARTMENT OF INDUSTRIAL RELATIONS, DIVISION OF OCCUPATIONAL SAFETY AND HEALTH, <br><br> Real Party in Interest and Respondent. | F076389 <br><br> (Super. Ct. No. 16CECG03592) <br><br><br> **OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Mark E. Cullers, Judge.

Sagaser, Watkins & Wieland, Howard A. Sagaser and Ian B. Wieland for Plaintiff and Appellant.

J. Jeffrey Mojcher, Aaron R. Jackson and Andia Farzaneh for Defendant and Respondent.

---

[*]    Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, only the Introduction, parts I. and II.a. of the Discussion, the Disposition, and the Concurring Opinion are certified for publication.

**SEE CONCURRING OPINION**

Nathan D. Schmidt and Carl Paganelli for Real Party in Interest and Respondent.

-ooOoo-

## INTRODUCTION

Nolte Sheet Metal, Inc. (the Company), owned in part by Ernie Nolte, fabricates air conditioning ducts. In 2014, Cal/OSHA[1] inspected the Company's shop and issued citations for various violations of California Code of Regulations, title 8.[2] The Company filed an appeal with the Occupational Safety and Health Appeals Board (Appeals Board). In a January 29, 2016 decision, the administrative law judge (ALJ) appointed by the Appeals Board concluded the evidence supported the violations underlying the challenged citations. The ALJ also found the violations underlying four of these citations were properly classified as "serious." The Company filed a petition for reconsideration, which was granted. In an October 7, 2016 decision after reconsideration, the Appeals Board upheld the ALJ's determinations. The Company then filed a petition for a writ of administrative mandamus. In a September 8, 2017 order, the Fresno County Superior Court denied writ relief.

On appeal from the superior court's order, the Company advances several arguments. First, the court should have exercised its independent judgment when it reviewed the Appeals Board's decision. Second, the Company did not freely and voluntarily consent to Cal/OSHA's inspection. Third, Cal/OSHA lost the original

---

[1]    "Cal/OSHA" is a common abbreviation for the California Department of Industrial Relations' Division of Occupational Safety and Health. (See, e.g., *Solus Industrial Innovations, LLC v. Superior Court* (2018) 4 Cal.5th 316, 324, fn. 1; *Rymel v. Save Mart Supermarkets, Inc.* (2018) 30 Cal.App.5th 853, 857; *Energy Ins. Mutual Limited v. Ace American Ins. Co.* (2017) 14 Cal.App.5th 281, 288; *Davis v. Kiewit Pacific Co.* (2013) 220 Cal.App.4th 358, 361; *Perez v. VAS S.p.A.* (2010) 188 Cal.App.4th 658, 669.)

[2]    Subsequent regulatory citations refer to California Code of Regulations, title 8. Hereafter, we use the shorthand "8 CCR" followed by the section number and subdivision (e.g., 8 CCR 4070(a)).

2.

inspection file, which deprived the Company of due process of law.  Finally, the violations underlying four of the citations were misclassified as "serious."

We conclude the superior court properly applied the substantial evidence standard of review.  Based on an examination of the administrative record, we further conclude substantial evidence supported the Appeals Board's findings, i.e., the Company freely and voluntarily consented to the inspection; Cal/OSHA's failure to preserve the original inspection file did not deprive the Company of due process; and the violations underlying the four contested citations were properly classified.  The order is affirmed.

### FACTUAL AND PROCEDURAL HISTORY[*]

Ramon Davila, a safety engineer/compliance officer employed by Cal/OSHA, visited the Company's facility on June 11, 2014.  He was accompanied by representatives of the California Department of Insurance, the Contractors State License Board, the Employment Development Department, and the Division of Labors Standard Enforcement.[3]  The "two or three" Department of Insurance officials carried handguns and wore bulletproof vests.  The four other officials—including Davila—were unarmed.

While the Department of Insurance officials waited outside, Davila and two others conducted an opening conference with John Nolte, Ernie's[4] son.  According to Davila, John "identified himself as the foreman" as well as "the son of the owner."  Davila advised he "was there to do a compliance inspection" and asked "if it was okay if [he] got started . . . ."  John replied, "[W]ell, I guess."  Although the Department of Insurance

---

[*]     See footnote, *ante*, page 1.

[3]     Cal/OSHA and the aforementioned agencies are members of the Labor Enforcement Task Force, which oversees joint targeted inspections of noncompliant businesses.

[4]     To avoid confusion, we distinguish individuals who share the Nolte surname by their given names.

3.

officials were "just outside the building" and uninvolved in the opening conference, John noticed their handguns and vests.

In the course of the inspection, Ernie arrived. He observed "a bunch of people milling around" and was told by John "they had to come in and do some inspections." Ernie noticed some of the officials were armed. He did not speak to Davila and did not object to the inspection. At the end of the inspection, Davila communicated solely with John, who had been "extremely cooperative."

Davila prepared an inspection file, which contained the following documents: (1) Form 1, which provided a tracking number and "basic information on the [Company]," such as the facility's address and the number of employees; (2) Form 1A, which specified "all of the things [the officials and John] [went] through in [the] opening conference," e.g., "whether or not the [Company] has any workers comp" and "whether consent was given or not," the employees interviewed, and the other witnesses present; (3) Form 1AY, which requested certain documents from the Company; (4) Form 1B, which summarized evidence of the Company's violations; (5) Form 1BX, a "brief generic description of what equipment [wa]s used and the hours of operation"; (6) Form 1BY, a "Notice of Intent to Issue a Serious Violation"; (7) Form 10, a "Penalty Calculation Sheet"; (8) photographs taken during the inspection; and (9) Davila's handwritten investigative notes.

After the Company received a copy of Form 1BY, John signed a June 23, 2014 "Employer[']s Signed Response to Notice of Intent to Issue Serious Violation." (Some capitalization omitted.) He identified himself as "Foreman."

On August 13, 2014, Cal/OSHA cited the Company for violating 8 CCR 4070(a)[5] ("Citation 3"); 8 CCR 4184(b) ("Citation 4"); 8 CCR 4227(a)[6] ("Citation 5"); and 8 CCR

---

[5] "All moving parts of belt and pulley drives located 7 feet or less above the floor or working level shall be guarded." (8 CCR 4070(a).)

4310(a)(2)[7] ("Citation 6"), inter alia. These violations were classified as "Serious." Later, by stipulation, Citation 4 was amended to allege a violation of 8 CCR 4214(a).[8] The Company contested these citations. In appeal forms filed with the Appeals Board on August 25, 2014, it did not dispute the occurrence of the aforementioned violations. Rather, the Company contended the violations were misclassified.

On October 10, 2014, the inspection file prepared by Davila was taken during a car burglary. (See at p. 6 & fn. 9, *post*.) On November 14, 2014, John and his sister Natalie Emerzian, the Company's controller, attended an informal conference with Cal/OSHA on the Company's behalf. On or around January 13, 2015, the Company received a copy of the reconstituted inspection file. (See at p. 6, *post*.) The documents in this file identified the officials present at the inspection, among others.

On May 12, 2015, the ALJ conducted an evidentiary hearing. At the outset, the Company's attorney moved to suppress evidence on the following bases: (1) the Company never consented to the inspection; and (2) Cal/OSHA spoliated the original inspection file. The ALJ stated she would allow the Company to "raise an issue about

---

[6]     "Mechanical power and foot and hand power metal shears shall be provided with a guard which will prevent the hands of the operator from entering the zone traveled by the knives of the shears while they are in motion. This guard may be a fixed barrier, set not more than 3/8-inch above the table (or in accordance with Figure G-8 and Table G-3 of [8 CCR ]4186), or a self-adjusting barrier with a limit of 3/8-inch above the table, but that will automatically rise to the thickness of the material." (8 CCR 4227(a).)

[7]     "Band knives and band saws (including band resaws having saw blades less than 7 inches in width or band wheels less than 5 feet in diameter) shall be guarded as follows: [¶] . . . [¶] . . . Band saw wheels shall be fully enclosed." (8 CCR 4310(a)(2).)

[8]     "Press brakes, mechanically or hydraulically powered, shall be guarded in a manner that will accomplish the following: [¶] (1) Restrain the operator(s) from inadvertently reaching into the point of operation, or [¶] (2) Inhibit machine operation if the operator's hand or hands are inadvertently within or placed within the point of operation, or [¶] (3) Automatically withdraw the operator's hands if they are inadvertently within the point of operation." (8 CCR 4214(a).)

5.

lack of consent" as the hearing proceeded "with the merits of the case." Thereafter, various witnesses testified.

Kevin Sage, an air conditioning duct installer employed by the Company for approximately 15 years, testified he and John were the only ones who worked at the facility and John directed him. Sage was present during the inspection and was interviewed by Davila.

Jan Hami, a district manager employed by Cal/OSHA, detailed her duties included reviewing inspection files, signing citations, and conducting informal conferences with employers. Sometime in October 2014, Hami left a bag inside her car, which was parked next to her office in Oakland. The bag contained the original inspection file. At some point, someone broke into the car and stole the bag, inter alia. Hami filed a police report[9] and instructed Davila to reprint the missing material. At the informal conference, she did not disclose the file had been stolen. Hami testified she did not deliberately lose the file.

Davila testified he had been employed by Cal/OSHA as an industrial hygienist before he served as a safety engineer. Over the course of his nearly 30-year tenure with the agency, he conducted 100 inspections annually on average. In addition, Davila's division-mandated training was up to date and he had a bachelor's degree in occupational health and safety. In October 2014, Hami apprised him of the stolen inspection file and asked him to recreate it. Davila could not obtain copies of Forms 1, 1A, and 1AY and could not replicate his handwritten investigative notes. He was able to reprint portions of the "1Bs," which were stored in a database,[10] and Form 10 and the photographs, which

---

[9]     On May 18, 2015, following the evidentiary hearing, Cal/OSHA submitted a copy of an October 16, 2014 "Oakland Police Department Summary Incident Report." (Some capitalization omitted.) The report specified someone "smashed the back window" of Hami's vehicle and "stole two black cases," one of which contained "State files," on October 10, 2014.

[10]     Davila testified: "[T]he 1Bs . . . are incomplete because [of] the way that [database] works . . . . [I]f something stays in [the database] for several months for some

6.

were stored in a local hard drive. Davila pointed out some of the information that was in his investigative notes "would have been recorded on the 1Bs."

Regarding Citations 3 through 6, Davila recounted:

"[Citation 3 involved] a belt pulley drive on the end of the shear . . . . [A]s I understood it and it was explained to me it vibrates off. It was not fastened to the shear and it vibrates off. And what I observed was the unguarded belt pulley drive . . . right next to the controls. [¶] . . . [¶] . . . I was told [by Sage] that the shear was used just about every day. [¶] . . . [¶] . . . [T]he nip point created by the belt and pulley drive could break bones. It could cause severe damage to the fingers or the hand or any extremity. [¶] . . . [¶] . . . The machine is in plain view as soon as you walk into the shop. [¶] . . . [¶]

"[Citation 4 involved] the brake which was located just on the opposite side of the entry way from the shear. It was not guarded. This type . . . of equipment, it can be difficult to guard. But there [is] at least the requirement for hand restraints so that in the event that the operator is working with something that he can completely restrict it from entering the danger zone. [¶] . . . [¶] . . . I don't recall the frequency, but I do know that the brake was being used. Not at the time of the inspection, but I did get evidence[, i.e., Sage's statement,] that it was used prior to the inspection. [¶] . . . [¶] . . . [T]his is a huge piece of machinery capable of bending metal. If a hand . . . or fingers get accidentally in . . . the area where the dies are . . . it could be very serious injuries. I mean . . . amputations or broken bones. [¶] . . . [¶] . . . [I]t was in plain view. [¶] . . . [¶]

"[Regarding Citation 5,] during the walkthrough inspection I observed the shear. And it was not completely guarded. . . . The right-hand corner of the shear did have a metal guard that prevented the fingers from entering . . . the area where the knife would travel. However, it was just a small section . . . of the shear. And the . . . guard actually is . . . made of metal and so you couldn't see the blade. You're actually supposed to be able to see the blade. [¶] . . . [¶] . . . [According to Sage,] the shear is pretty much used every day. [¶] . . . [¶] . . . There is the possibility for serious harm because . . . this blade is cutting through metal and so it could do the same to any fingers or hands that got in the way. [¶] . . . [¶] . . . [I]t was located in plain view. [¶] . . . [¶]

---

reason it doesn't maintain all the data. And so when I printed out some of the 1Bs they were not complete."

"[Citation 6 involved] a bandsaw that the employee was using to . . . cut bolts. And the top of the bandsaw and the bottom of the bandsaw were unguarded. The top of the bandsaw was the primary concern because it was exposing the wheel. [¶] . . . [¶] . . . [I]f somebody put their hand in there . . . they could have an amputation. [¶] . . . [¶] . . . [I]t was in plain view."

John testified he was an hourly worker and neither an owner nor an officer of the Company. His job title varied. If John was "in the field," where he worked "the majority of the time," he was a "Foreman." If he was on duty at the facility, he was an "Employee." On the day of the inspection, "[a]pproximately seven [agency officials] kind of storm[ed] the driveway" and "kind of bombarded" "the door." Some of the individuals had "vests, hats, star patches," "[p]istols," and "holster[s]." John acknowledged he saw the weapons "a little bit more on accident" as they were not being openly displayed. He did not recall with whom he first spoke because he "was bombarded by seven different people at once" but indicated he was not an owner. Although John allowed the inspection, under the circumstances, he did not believe he could refuse.

Ernie and Emerzian each testified John was an hourly worker and neither an owner nor an officer of the Company.

On January 29, 2016, the ALJ issued her decision. Her conclusions included: (1) Cal/OSHA received consent to conduct the inspection; (2) Cal/OSHA's failure to preserve the original inspection file did not constitute spoliation of evidence and did not deny due process of law; and (3) the violations underlying Citations 3 through 6 were properly classified as "serious." The decision read, in pertinent part:

"Dav[i]la testified that on June 11, 2014, when members of the . . . [t]ask [f]orce approached John . . . , who was working in the shop, he identified himself as the 'foreman' and the person in charge, and gave Dav[i]la permission to inspect the premises. . . . [¶] . . . Sage . . . was present during the inspection. He has worked for [the Company] for fifteen years as an installer and testified that John . . . directs his work in the shop. [¶] John . . . testified that he works in [the Company]'s shop and is an

8.

employee. He admitted that when he is in the field installing the sheet metal fabricated at [the Company]'s shop, he is a 'foreman'. On the day of the inspection, he was asked by the members of the [t]ask [f]orce whether they could look around the shop. He testified that he replied 'I guess' but does not recall any other details. John . . . responded to the [1]-B-Y letter on behalf of [the Company], and identified his title as 'foreman'. . . . On November 14, 2014, John . . . and . . . Emerzian attended the informal conference with Hami and Dav[i]la as [the Company]'s representatives . . . . [¶] Ernie . . . testified that he appeared at the shop while the inspection was ongoing, and made no effort to speak with Dav[i]la during the inspection. He did not . . . object to John . . . acting on behalf of the [Company], raise an issue that John . . . was acting without authority, or object to the inspection. . . . [¶] Preponderance of the evidence establishes that [Cal/OSHA]'s inspection was lawful. [The Company] did not object to the inspection and John . . . had apparent authority to consent to the inspection." (Footnote omitted.)

"[The Company] filed a motion to suppress evidence and throughout the hearing sought to exclude evidence based on the fact that the investigation file was stolen from [Hami]'s car. It alleged that because the complete file was missing, it was not provided with the names of the other individuals from other state agencies . . . who were present during the inspection. This claim is rejected. . . . [T]he [i]nvestigative [f]ile provided to the [Company] on January 13, 2015, contained . . . [f]orm[s] . . . which state[] the names of the [t]ask [f]orce members and their affiliations. [The Company]'s request for sanctions is denied because, based on the facts in the record, there was no denial of due process or spoliation of evidence shown."

"The investigative file was stolen from . . . Hami's . . . car. [The Company] filed a motion to suppress evidence based on the fact that some of the documents in [Cal/OSHA]'s file are no longer available. Hami testified credibly that the case file was stolen from her car in October, 2014, over two months after the citations were issued in July 2014, but before the informal conference with John . . . . Pursuant to a request by the [ALJ] at the hearing, [Cal/OSHA] provided a police report showing that the break-in was reported on October 16, 2014. [Cal/OSHA]'s file was partially reconstituted by printing out the information from [Cal/OSHA]'s computer records. The reconstituted file was provided to [the Company] on January 13, 2015. . . . Although Dav[i]la's original investigative notes concerning the evidentiary basis for issuing the citations are no longer available, the information from those notes were typed into the forms on [Cal/OSHA]'s computer and provided to [the Company], together with

copies of photographs taken during the inspection before the citations were issued. [The Company]'s request is denied because 1) it failed to identify the harm caused by the loss of some of the documents in the file, 2) it had an opportunity to cross-examine Dav[i]la at the hearing, and 3) it failed to identify any prejudice caused by the loss of the file."

"Citation 3 . . . involves the guard on the belt and pulley drives of the shear, which vibrates off. Dav[i]la observed that the belt pulley drive at the end of [the] shear was unguarded . . . . Dav[i]la testified that there is a realistic possibility that serious physical harm could result from improper guarding of the belt and pull[e]y drive. The controls are located in proximity to the drive and the nip point created by the drive could realistically break bones or cause severe damage to the fingers and hands of the operator. Sage told Dav[i]la that the shear is used every day and was in plain view in the shop. . . . [¶] Dav[i]la's unrebutted opinion as to the realistic possibility of a serious injury caused by an accident involving an improper guarding of the belt and pull[e]y drive on the shear is found credible and is accepted. . . .

"Citation 4 . . . involves the failure to guard press brakes at the point of operation. The brake located on the opposite side of the entry way, which Dav[i]la observed during the inspection, was not guarded . . . . Dav[i]la testified that he observed the press brakes in plain view in the shop and that there is a realistic possibility that serious physical harm could result from the failure to guard the press brake at the point of operation. The press brake is capable of bending metal and lack of guarding could result in amputations or broken bones, if the fingers and hands of the operator enter the point of operation. . . . [¶] . . . Dav[i]la's opinion was based upon a reasonable evidentiary foundation. . . . Dav[i]la's opinion that a realistic possibility that serious injury could result from the failure to guard the press brake is found credible and is accepted. . . .

"Citation 5 . . . involves a failure to guard the sheet metal shear. Dav[i]la testified that there is a realistic possibility that serious physical harm could result from the absence of a guard since the sheet metal shear is cutting through metal. If the fingers and hands of the operator enter the point of operation, it could result in amputations or broken bones. . . . This equipment was also in plain view in the shop. [¶] . . . Dav[i]la's opinion was based upon a reasonable evidentiary foundation. . . . Dav[i]la's opinion that there is a realistic possibility that a serious injury could be caused by an accident involving the failure to guard the sheet metal shear is found credible and is accepted. . . .

10.

"Citation 6 . . . involves guarding of band knives and saws. Dav[i]la testified that the metal shear, which was used every day, was not guarded . . . . He observed that the top of the band saw was unguarded, exposing the wheel . . . . There is a realistic possibility that serious physical harm could result. If a hand is placed inside the guard near the wheel, it could result in amputations or broken bones. . . . This equipment was also in plain view in the shop. [¶] . . . Dav[i]la's opinion was based upon a reasonable evidentiary foundation. . . . Dav[i]la's opinion that there is a realistic possibility that a serious injury could be caused by an accident involving the failure to guard the band saw is found credible and is accepted. . . . [¶] . . . [¶]

"[The Company's] knowledge of the violations in Citations 3 through 6 was not contested . . . and the [existence of the] violations w[as] not contested. The serious classifications were not rebutted." (Fns. omitted.)

On March 7, 2016, the Company petitioned for reconsideration of the ALJ's decision. It reiterated: (1) it did not freely and voluntarily consent to Cal/OSHA's inspection; (2) Cal/OSHA's spoliation of the original inspection file deprived it of due process; and (3) the violations underlying Citations 3 through 6 were misclassified as "serious." On April 27, 2016, the Appeals Board took the Company's petition under submission.

On October 7, 2016, the Appeals Board issued its decision after reconsideration. It concluded, inter alia: (1) Cal/OSHA received consent to conduct the inspection; (2) assuming, arguendo, Cal/OSHA spoliated the original inspection file, its failure to preserve this file did not warrant any sanctions and did not deny due process; and (3) the violations underlying Citations 3 through 6 were properly classified as "serious." The decision read, in pertinent part:

"A review of the particular circumstances in this matter leads to the conclusion that John . . . had authority to, and did, consent to [Cal/OSHA]'s inspection of the premises. . . . Davila said he asked for the person in charge when he entered [the Company]'s worksite. Davila testified that John . . . identified himself as the person in charge and also identified himself as a foreman. Davila let John . . . know that he was there to do a compliance inspection and asked if it was alright for him to get started,

whereupon John . . . consented.  John . . . admits he was asked if they could look around, and that he responded affirmatively by stating 'I guess.' These facts demonstrate that consent to the inspection was freely given by the person in charge at the time. . . .

"In addition to the foregoing testimony, John['s] . . . authority to grant consent was also indicated when he prepared the response to [Form] 1BY, wherein he again identified himself as the foreman.  It was also corroborated by the testimony of employee . . . Sage, who stated he worked under the direction of John . . . when in the shop.  Additionally, it is noted that John . . . is not just a foreman; he is also the son of a shareholder and officer for the [Company], . . . leading to an inference, when considered in aggregate with other record evidence, that John . . . had authority to consent to the inspection.  [¶]  Even assuming John . . . did not have actual authority to grant consent to the administrative search, Davila's belief in John['s] . . . apparent authority was reasonable and therefore the search remains valid. . . .

"[The Company] next contends that John . . . only consented to the inspection because he was intimidated by armed members of the task force accompanying Davila.  [The Company] argues that consent to the search was not freely given. . . .  Davila was not armed.  The evidence demonstrated that Davila was accompanied on the inspection by some armed members of the Department of Insurance . . . .  However, their weapons remained holstered and they conducted themselves peaceably. John . . . admitted that the weapons were not openly displayed, and stated he only noticed the weapons by accident.  We conclude that the fact that members of the task force carried holstered weapons and wore body armor does not by itself invalidate consent nor demonstrate that consent was not freely given under these facts.  [¶] . . . [¶]

"It is not disputed that [Cal/OSHA]'s original inspection file was not preserved for hearing. . . .  Hami . . . testified she removed the original inspection file from [Cal/OSHA's] office in order to review it after the citations were issued.  She left the file in her car.  Her car was broken into and the file was stolen.  She filed a police report documenting the theft. Hami said she instructed Davila to recreate the file following the theft. . . . Davila was able to reconstitute his pictures, which identified and documented many of the purported violations. . . .  However, [Cal/OSHA] was unable to recreate certain portions of the file, including:  Davila's original investigative notes; [Cal/OSHA]'s document request sheets provided to [the Company]; [Form] 1A, documenting the persons Davila talked to, documenting many of the things discussed in the opening

conference, and providing a list of employees interviewed; and, [Cal/OSHA] could not fully recreate all of the . . . 1B's, which contain summaries of evidence related to the various citations. [The Company] was not informed of the loss of the file until later in the proceedings.

"Assuming the loss of the original file constituted spoliation, we are not persuaded that any sanctions are appropriate. While Hami's conduct in leaving the file in the car was ill-advised, there is no evidence of a conscious or willful effort to suppress evidence by [Cal/OSHA]. There is also no evidence, nor even any specific indication, that any significant relevant evidence actually existed in the missing records that would necessitate a remedial sanction. While [the Company] offers considerable speculation regarding the potential existence of relevant and/or exculpatory information in the lost portions of the file, the Board cannot fashion a remedy based on speculation . . . . The loss of the original file does not justify the windfall of terminating sanctions requested by [the Company], nor any other sanction, under the specific facts of this matter. We also observe no due process violation. The loss of the original file did not deprive [the Company] of the ability to make its defense. . . . Here, the bulk of the file and evidence was able to be recreated through other means. Additionally, all participants were available to testify and be cross-examined at hearing with regard to the facts of the case. [¶] . . . [¶]

"[The Company] contends [Cal/OSHA] failed to meet its burden of proof to establish the serious classification[s]. . . . Davila is deemed competent by operation of law to establish each element of a serious violation because his training is up to date . . . . Davila has been employed with [Cal/OSHA] for approximately 30 years and averages 100 inspections per year. He also has a degree in occupational safety and health.

"Citation 3 . . . asserted a serious violation of [8 CCR] 4070[(a)] [failure to guard belt and pulley drives]. During his inspection, Davila observed an unguarded belt and pulley drive on the end of a shear. The machine controls were located near the belt and pulley drive. The guard had vibrated off. . . . He said the entire belt and pulley drive should have been guarded. Davila said the violation created a realistic possibility of death or serious physical harm. The nip-point created by the belt and pulley drive could break bones and/or cause severe damage to fingers, hand, or other extremities. The Board credits Davila's testimony and finds with respect to Citation 3 that [Cal/OSHA] established a presumption of a serious violation.

"Citation 5 . . . asserted a serious violation of [8 CCR] 4227[(a)] [failure to properly guard metal shears]. Davila said he observed a shear

13.

that was not completely guarded. There was a portion of the shear that did not have a guard preventing fingers from entering where the blade traveled. . . . Davila said there is a realistic possibility of serious harm because the blade cuts through metal and could cut through hands and body parts that enter the point of operation of the blade. The Board credits Davila's testimony and finds with respect to Citation 5 that [Cal/OSHA] established a presumption of a serious violation.

"Citation 6 . . . asserted a serious violation of [8 CCR] 4310[(a)(2)] [failure to properly guard band saw wheels]. Davila said he observed a band saw. The top of the band saw was not fully guarded, exposing the wheel. . . . Davila testified to a realistic possibility of serious harm because if someone put their hand in the exposed area an amputation could occur. The Board credits Davila's testimony and finds with respect to Citation 6 that [Cal/OSHA] established a presumption of a serious violation. [¶] . . . [¶]

". . . [T]he record presented no evidence sufficient to rebut the presumption as to Citations 3, 5, and 6. There was no credible evidence that [the Company] provided training with respect to the hazards attendant to guarding violations. There was no credible evidence demonstrating the existence of procedures for discovering, controlling, or correcting guarding hazards. There was no credible evidence of any procedures for communicating to employees about the [Company]'s health and safety rules. . . . [The Company] also failed to elucidate on its efforts to effectively supervise employees exposed to guarding hazards. In addition, Davila said the violations were in plain view, providing [the Company] notice of the presence of the violations. . . . [¶] . . . Under the circumstances present here, we cannot state [the Company] took all the steps a reasonable and responsible employer in like circumstances should be expected to take, before the violation occurred, to anticipate and prevent the violation. [¶] . . . [¶]

"Unlike Citations 3, 5, and 6, the Board will reconsider both the existence and the classification of Citation 4. . . . [T]he Board observes that an amendment was made to this citation at the commencement of the hearing, changing the section number cited [to 8 CCR 4214(a)]. New changes in amendments are deemed controverted by operation of law unless an alternate intent is clearly evidenced. . . . Here, there was no explicit waiver after the amendment occurred, and thus the citation is deemed controverted. We address this citation fully on the merits. [¶] . . . [¶]

14.

"Davila said he observed a brake with a point of operation that created a pinch point. He said the brake was not satisfactorily guarded to prevent the operator's hands from entering the danger zone created by the pinch point. . . . While he acknowledged the machine would have been difficult to guard, he said hand restraints would have been a satisfactory method to restrain the operator's hand from the point of operation. Davila's testimony is credited and sufficiently establishes the existence of a violation. [¶] . . . [¶]

"Under the standards discussed in the preceding section, the evidence also supports the serious classification. Davila said there was a realistic possibility of death or serious physical harm. The brake was a large piece of machinery capable of bending metal. He said if an employee's hand were to accidentally enter the point of operation there could be a serious injury, amputation or broken bones. The Board credits Davila's testimony and finds [Cal/OSHA] established a presumption of a serious violation. [The Company] failed to rebut the presumption. Davila said the violation was in plain view and, as discussed above, there is no evidence regarding [the Company]'s efforts or procedures to identify, control, and train on the relevant hazards, or provide appropriate supervision." (Fns. omitted.)

The Company filed a petition for a writ of administrative mandamus. In a September 8, 2017 order, the Fresno County Superior Court denied writ relief. It concluded substantial evidence supported the Appeals Board's findings that (1) the Company freely and voluntarily consented to the inspection; (2) Cal/OSHA's unintentional loss of the original inspection file did not deprive the Company of due process; and (3) the violations underlying Citations 3 through 6 were properly classified as "serious."

## DISCUSSION

### I. Appellate standard of review

"[The substantial evidence] test 'requires a review of the entire record to determine whether findings . . . are supported by substantial evidence.' [Citation.] If the . . . decision is supported by substantial evidence, we may not overturn it merely because a contrary finding would have been equally or more reasonable. [Citation.] 'In general, substantial evidence has been defined in two ways: first, as evidence of " ' "ponderable

15.

legal significance . . . reasonable in nature, credible, and of solid value" ' " [citation]; and second, as " 'relevant evidence that a reasonable mind might accept as adequate to support a conclusion' " [citation].' [Citation.] 'Unless the finding, viewed in the light of the entire record, is so lacking in evidentiary support as to render it unreasonable, it may not be set aside.' [Citation.]" (*Ogundare v. Department of Industrial Relations* (2013) 214 Cal.App.4th 822, 829-830 (*Ogundare*); see *Teichert Construction v. California Occupational Safety & Health Appeals Bd.* (2006) 140 Cal.App.4th 883, 888 ["We view the evidence in a light most favorable to the . . . decision, drawing all reasonable inferences and resolving all conflicts in the evidence in favor of the decision."].)

" '[A]n appellate court reviewing the superior court's administrative mandamus decision always applies a substantial evidence standard. [Citations.]' [Citation.] However, 'the reviewing court's *focus* changes, depending on which standard of review governed [below].' [Citation.] '[D]epending on whether the trial court exercised independent judgment[11] or applied the substantial evidence test, the appellate court will review the record to determine whether either the trial court's judgment or the agency's findings, respectively, are supported by substantial evidence. [Citation.] If . . . the trial court . . . exercised independent judgment, it is the trial court's judgment that is the subject of appellate court review. [Citations.] On the other hand, if the superior court . . . applied substantial evidence review . . . , then the appellate court's function is identical to that of the trial court. It reviews the administrative record to determine whether the agency's findings were supported by substantial evidence, resolving all conflicts in the

---

**11** "In independent review, . . . although the trial court begins its review with a presumption that the administrative findings are correct, it does *not* defer to the fact finder below and accept its findings whenever substantial evidence supports them. Instead, it must weigh all the evidence for itself and make its *own* decision about which party's position is supported by a preponderance. [Citation.] The question is not whether any rational fact finder could make the finding below, but whether the reviewing court believed the finding actually was correct." (*Alberda v. Board of Retirement of Fresno County Employees' Retirement Assn.* (2013) 214 Cal.App.4th 426, 435.)

evidence and drawing all inferences in support of them.  [Citations.]'  [Citation.]"
(*Ogundare*, *supra*, 214 Cal.App.4th at pp. 828-829.)

## II.  Analysis

### a.  *The superior court properly applied the substantial evidence standard of review.*

In its September 8, 2017 order denying the Company's writ petition, the superior court evaluated whether the Appeals Board's decision was supported by substantial evidence.  The Company contends the court should have exercised its independent judgment on the evidence.  We disagree.

"When a trial court reviews an administrative determination by writ of administrative mandate, the appropriate standard of review depends on both the type of the agency rendering the decision and the nature of the right involved.  Decisions issued by 'agencies of constitutional origin which have been granted limited judicial power by the Constitution itself' [citation] are 'entitled to all the deference and respect due a judicial decision.' "  (*Rodriguez v. City of Santa Cruz* (2014) 227 Cal.App.4th 1443, 1451, quoting *Strumsky v. San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 35, 36.)  "The deferential substantial evidence standard of review applies regardless of the nature of the right at issue."  (*Rodriguez v. City of Santa Cruz*, *supra*, at p. 1451, citing *Strumsky v. San Diego County Employees Retirement Assn.*, *supra*, at p. 36.)  Prior to 1979, "it was held that unless authorized by the California Constitution, administrative agencies could not exercise judicial power and that the separation of powers doctrine required courts to independently determine the weight of the evidence when reviewing adjudicative decisions of agencies lacking judicial power."  (*Frink v. Prod* (1982) 31 Cal.3d 166, 172-173 (*Frink*).)  However, in *Tex-Cal Land Management, Inc. v. Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335, 346 (*Tex-Cal*), which

17.

involved the Agricultural Labor Relations Act,[12] our Supreme Court held "the Legislature may accord finality to the findings of a statewide agency that are supported by substantial evidence on the record considered as a whole and are made under safeguards equivalent to those provided by the [Agricultural Labor Relations Act] for unfair labor practice proceedings, whether or not the California Constitution provides for that agency's exercising 'judicial power.' " (*Tex-Cal*, *supra*, at p. 346; accord, *Frink*, *supra*, at p. 173.) These safeguards include "the separation of prosecutorial from adjudicatory functions [citations], notice, written pleadings, evidentiary hearings [citations], and a requirement that orders be accompanied by findings based on the preponderance of the reported evidence [citations]." (*Tex-Cal*, *supra*, at p. 345.)

By contrast, "[t]he trial court is authorized to exercise its independent judgment on the evidence where the administrative agency is of legislative origin and its decision affects a fundamental vested right." (*Champion Motorcycles, Inc., v. New Motor Vehicle Bd.* (1988) 200 Cal.App.3d 819, 823-824; see *Berlinghieri v. Department of Motor Vehicles* (1983) 33 Cal.3d 392, 396 ["The term 'vested' denotes a right that is either 'already possessed' [citation] or 'legitimately acquired' [citation]."]; *Bixby v. Pierno* (1971) 4 Cal.3d 130, 144 ["In determining whether the right is fundamental[,] the courts do not alone weigh the economic aspect of it, but the effect of it in human terms and the importance of it to the individual in the life situation."]; *Ogundare*, *supra*, 214 Cal.App.4th at p. 827 [" 'If . . . the administrative decision neither involves nor substantially affects a fundamental vested right, the trial court's review is limited to determining whether the administrative findings are supported by substantial evidence.' "].)

In view of *Tex-Cal*, we conclude the superior court properly applied the substantial evidence standard of review. First, the Legislature accorded finality to the

---

[12]    Labor Code section 1140 et seq.

18.

Appeals Board's findings that are supported by substantial evidence. Under Labor Code section 6629, in a writ proceeding, "[t]he review by the court shall not be extended further than to determine, based upon the entire record which shall be certified by the [A]ppeals [B]oard, whether: [¶] (a) The [A]ppeals [B]oard acted without or in excess of its powers. [¶] (b) The order or decision was procured by fraud. [¶] (c) The order or decision was unreasonable. [¶] (d) The order or decision was not supported by substantial evidence. [¶] (e) If findings of fact are made, such findings of fact support the order or decision under review. [¶] Nothing in this section shall permit the court to hold a trial de novo, to take evidence, or to exercise its independent judgment on the evidence." (Compare with *id.*, § 5952 [nearly identical language relating to petition for review of Workers' Compensation Appeals Board's order, decision, or award].) Labor Code section 6630 adds: "The findings and conclusions of the [A]ppeals [B]oard on questions of fact are conclusive and final and are not subject to review. Such questions of fact shall include ultimate facts and the findings and conclusions of the [A]ppeals [B]oard." (Compare with *id.*, § 5953 [identical language relating to petition for review of Workers' Compensation Appeals Board's order, decision, or award].) In *Tex-Cal*, the Supreme Court found determinative the following language in Labor Code section 1160.8: "The findings of the [Agricultural Labor Relations B]oard with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall . . . be conclusive." (See *Tex-Cal*, *supra*, 24 Cal.3d at pp. 340, 344-346.) Likewise, or perhaps more so, Labor Code sections 6629 and 6630—in tandem—mandate judicial deference to the administrative findings. (Cf. *LeVesque v. Workmen's Comp. App. Bd.* (1970) 1 Cal.3d 627, 637, fn. 19 [interpretation of Lab. Code, §§ 5952 & 5953].)

Second, the statutory and regulatory scheme "contains ample safeguards of fair procedure at the administrative level." (*Tex-Cal*, *supra*, 24 Cal.3d at p. 346.) Following an inspection, Cal/OSHA must issue a citation if it believes the employer violated an

occupational safety and health standard, rule or order (Lab. Code, § 6317)[13] and notify the employer of the citation via certified mail (Lab. Code, § 6319, subd. (a)). The employer may appeal to the Appeals Board (*id.*, § 6600) and the Appeals Board "shall afford an opportunity for a hearing" (*id.*, § 6602),[14] which is either recorded electronically or transcribed by a certified court reporter (8 CCR 376.7(a)). Any party may elect to have a representative, "who is not required to be an attorney at law." (8 CCR 378(a).) An ALJ may be assigned to hold the hearing, try the issues, and make an order or decision (Lab. Code, § 6604; 8 CCR 375.1), but a party may object to the

---

[13] "The citation form shall set forth:  [¶]  (a) The name of the employer, the employer's address and the workplace inspected;  [¶]  (b) The nature of the violation, in specific terms with reference to the provision of the code, standard, regulation or order alleged to have been violated;  [¶]  (c) Time allowed for correction of alleged violation;  [¶]  (d) Rights of employees respecting the time fixed for correction of violations;  [¶] (e) Posting requirements;  [¶]  (f) Time within which an employer may contest a citation; and  [¶]  (g) Such other information as [Cal/OSHA] deems appropriate for clear understanding of the form issued."  (8 CCR 332.)

Cal/OSHA may issue a " 'notice' in lieu of citation" under certain circumstances. However, said notice "shall not be issued . . . if the violations are serious," inter alia. (Lab. Code, § 6317.)

[14] Whereas Cal/OSHA "shoulders primary responsibility for administering and enforcing the California Occupational Safety and Health Act of 1973 . . . , Labor Code section 6300 et seq.," "through investigating workplaces and enforcing occupational safety and health standards" (*Rick's Electric, Inc. v. Occupational Safety & Health Appeals Bd.* (2000) 80 Cal.App.4th 1023, 1026), the Appeals Board "is an independent adjudicatory agency responsible, among other matters, for resolving appeals from citations" (*id.* at p. 1027). (See 8 CCR 354(a) ["[Cal/OSHA] is a party to all proceedings before the Appeals Board, whether or not [Cal/OSHA] has appeared or participated in a proceeding."]; see also *In the Matter of the Appeal of Stockton Tri Industries, Inc.*, OSHAB 02-R5D1-4946, Decision After Reconsideration (Mar. 27, 2006) [2006 WL 1062024] ["The [Appeals] Board is mindful that there is a separation of powers . . . .  The [Occupational Safety and Health] Standards Board is vested with quasi-legislative authority to promulgate health and safety standards and safety orders. . . .  [Cal/OSHA] has executive enforcement authority of the [California Occupational Safety and Health] Act . . . .  The Appeals Board has quasi-judicial power to determine appeals from citations, penalties, and orders issued by [Cal/OSHA]."].)

20.

appointment on certain grounds, including bias (Lab. Code, § 6606; 8 CCR 375.2(b)). Prehearing discovery provisions detail procedures for identification of witnesses (8 CCR 372), access to documents (8 CCR 372.1), subpoenas and subpoenas duces tecum (8 CCR 372.2), and depositions (Lab. Code, § 6613; 8 CCR 372.3). Ex parte communications are generally prohibited. (8 CCR 352.) While "[t]he hearing need not be conducted according to technical rules relating to evidence and witnesses" (8 CCR 376.2), testimony "shall be taken only on oath, affirmation, or penalty of perjury" (8 CCR 376.1(a)) and parties have the right "[t]o call and examine witnesses; to introduce exhibits; to question opposing witnesses on any matter relevant to the issues even though that matter was not covered in the direct examinations; to impeach any witness regardless of which party first called the witness to testify; and to rebut any opposing evidence" (8 CCR 376.1(b)). Based on administrative case precedent, Cal/OSHA has the burden to prove by a preponderance of the evidence that the employer violated an occupational safety and health standard, rule or order. (See, e.g., *In the Matter of the Appeal of Land O' Lakes Purina Feed, LLC*, OSHAB 08-R2D4-1843, Decision After Reconsideration (Jan. 31, 2014) [2014 WL 590179]; *In the Matter of the Appeal of Western Can Company, Wescan, Inc.*, OSHAB 83-R4D2-741, Decision After Reconsideration (Dec. 22, 1987) [1987 WL 270561].)[15, 16] Following the hearing, the Appeals Board or the ALJ "shall . . . make and file findings upon all facts involved in the appeal and file an order or decision. Together with the findings or the decision, there shall be served upon all the

---

**15**      Decisions of the Appeals Board are binding on Cal/OSHA. (Lab. Code, § 148.6; *In the Matter of the Appeal of Limberg Construction*, OSHAB 78-R2D1-433, Grant of Petition for Reconsideration and Decision After Reconsideration (Feb. 21, 1980) [1980 WL 100701].)

**16**      Likewise, Cal/OSHA "has the burden of proving, by a preponderance of evidence, free and voluntary consent as a justification for a warrantless inspection." (*In the Matter of the Appeal of Rudolph and Sletten, Inc.*, OSHAB 01-R1D5-478, Decision After Reconsideration (Mar. 30, 2004) [2004 WL 817770].)

parties to the proceedings a summary of the evidence received and relied upon and the reasons or grounds upon which the decision was made." (Lab. Code, § 6608.)

Furthermore, within 30 days of service of a decision, an aggrieved party may petition for reconsideration. (Lab. Code, § 6614, subd. (a); 8 CCR 390.) The Appeals Board "may, with or without further proceedings and with or without notice affirm, rescind, alter, or amend the order or decision made and filed . . . on the basis of the evidence previously submitted in the case, or may grant reconsideration and direct the taking of additional evidence." (Lab. Code, § 6620.) "Notice of the time and place of any hearing on reconsideration shall be given to the petitioner and adverse parties and to such other persons as the [A]ppeals [B]oard orders." (*Ibid.*) "Any decision of the [A]ppeals [B]oard granting or denying a petition for reconsideration or affirming, rescinding, altering, or amending the original findings, order, or decision following reconsideration shall be made by the [A]ppeals [B]oard and not by a hearing officer and shall be in writing, signed by a majority of the [A]ppeals [B]oard members assigned thereto, and shall state the evidence relied upon and specify in detail the reasons for the decision." (*Id.*, § 6623.)

In its reply brief, the Company highlights the following language in *Tex-Cal*, *supra*, 24 Cal.3d at page 346: "Our holding does not . . . affect review of administrative findings where the Legislature has left the choice of standard to the courts (e.g., as in [Code of Civ. Proc.] § 1094.5)." The Company then suggests *Tex-Cal* "has no bearing on the instant case" because it filed its writ petition pursuant to Code of Civil Procedure section 1094.5. "[Code of Civil Procedure] [s]ection 1094.5 was designed to leave to the courts the establishment of standards for deciding which cases require independent judgment review and which substantial evidence review." (*Frink*, *supra*, 31 Cal.3d at p. 173.) As noted, however, the language of Labor Code sections 6629 and 6630 calls for judicial deference to the Appeals Board's findings. Nothing in those provisions indicate the Legislature has left the choice of standard to the courts. (Cf. Welf. & Inst. Code,

22.

§ 10962 ["The applicant, recipient, respondent, or the affected county . . . may file a petition with the superior court, under the provisions of Section 1094.5 of the Code of Civil Procedure, praying for a review of the entire proceedings in the matter, upon questions of law involved in the case."]; *Frink, supra*, at p. 173 ["[Explicit] reference to [Code of Civil Procedure] section 1094.5 does not reflect a legislative direction to apply substantial evidence review, but in the absence of limitation reflects legislative intent to leave to the courts the determination of the appropriate standard of review."].)

      b. *Substantial evidence demonstrated the Company freely and voluntarily consented to the inspection.**

Cal/OSHA "shall, upon presenting appropriate credentials to the employer, have free access to any place of employment to investigate and inspect during regular working hours, and at other reasonable times when necessary for the protection of safety and health, and within reasonable limits and in a reasonable manner." (Lab. Code, § 6314, subd. (a).) "If permission to investigate or inspect the place of employment is refused, . . . [Cal/OSHA] may obtain an inspection warrant . . . ." (*Id.*, subd. (b); see *Salwasser Manufacturing Co. v. Occupational Saf. & Health Appeals Bd.* (1989) 214 Cal.App.3d 625, 628-632 [lesser standard of administrative probable cause generally applies].)

When the government relies upon consent to justify the lawfulness of a search, it has the burden to prove the consent was freely and voluntarily given. (See *Bumper v. North Carolina* (1968) 391 U.S. 543, 548.) "The voluntariness of the consent is in every case 'a question of fact to be determined in the light of all the circumstances.' [Citations.]" (*People v. James* (1977) 19 Cal.3d 99, 106.) "The question of the voluntariness of the consent is to be determined in the first instance by the trier of fact; and in that stage of the process, 'The power to judge credibility of witnesses, resolve conflicts in testimony, weigh evidence and draw factual inferences, is vested in the [trier

---

  *      See footnote, *ante*, page 1.

23.

of fact]. On appeal all presumptions favor proper exercise of that power, and the [trier of fact]'s findings—whether express or implied—must be upheld if supported by substantial evidence.' [Citations.]" (*Id.* at p. 107.)

The record—viewed in the light most favorable to the administrative decision—shows Davila asked John for permission to conduct the inspection. "[S]uch a request, by its nature, carries the implication that permission may be withheld." (*People v. Ledesma* (2006) 39 Cal.4th 641, 704.) John replied, "[W]ell, I guess." "[T]here is no talismanic phrase which must be uttered . . . in order to authorize a search" (*People v. James*, *supra*, 19 Cal.3d at p. 113) and John's answer was as affirmative as, if not more so than, other responses that have been found to evince consent. (See, e.g., *People v. Perillo* (1969) 275 Cal.App.2d 778, 779, 782 [" 'I don't care.' "]; *People v. Dahlke* (1967) 257 Cal.App.2d 82, 85, 86-88 [" 'Do what you want.' "]; *People v. Justiniano* (1965) 236 Cal.App.2d 542, 544 [" '[G]o ahead if you want to.' "].) Although the Company maintains John had been intimidated by the presence of the armed Department of Insurance officials, there was no evidence any of these officials "displayed their weapons or other signs of force" (*People v. Hernandez* (1988) 199 Cal.App.3d 1182, 1188) or "made any improper inducements to obtain consent" (*ibid.*). Davila even testified John had been "extremely cooperative" throughout the inspection, a factor that militates against a finding of coercion. (See *People v. Rupar* (1966) 244 Cal.App.2d 292, 298-299.)

Alternatively, the Company asserts John did not have any authority to consent to the inspection. Assuming, arguendo, John did not have the actual authority to consent, a search remains reasonable when it is permitted by someone who the government reasonably and in good faith believes is authorized to give consent. (*People v. Carr* (1972) 8 Cal.3d 287, 298.) In determining whether the government reasonably relied on an individual's apparent authority, we ask whether the facts available to the government at the moment would convince a person of reasonable caution that the consenting

individual had authority over the premises. (*Illinois v. Rodriguez* (1990) 497 U.S. 177, 188; *People v. MacKenzie* (1995) 34 Cal.App.4th 1256, 1273.) Here, the record shows John identified himself to Davila as the foreman and the son of the owner prior to the inspection. Sage, who was employed by the Company for approximately 15 years and was present at the inspection, testified John was his superior. Ernie, John's father and the Company's co-owner, appeared while the inspection was ongoing. He never objected to the inspection or otherwise advised Davila or the other officials that John was not authorized to give consent. Later, John (1) signed the Company's June 23, 2014 response to Form 1BY and once again identified himself as "Foreman"; and (2) attended the informal conference alongside Emerzian on the Company's behalf. Given the totality of the circumstances, Cal/OSHA could reasonably and in good faith assume John had the authority to consent to the inspection.[17]

> c. *Cal/OSHA's failure to preserve the original inspection file did not deprive the Company of due process.*[*]

Due process requires the government to preserve evidence in its possession where it is reasonable to expect the evidence would play a significant role in the opposing party's defense. (See *People v. Alexander* (2010) 49 Cal.4th 846, 878.) The evidence must (1) possess an exculpatory value that was apparent before the evidence was destroyed; and (2) be of such a nature that the opposing party would be unable to obtain comparable evidence by other reasonably available means. (See *ibid.*) However, if no more can be said of the evidence than that it might be potentially useful, the government's failure to preserve the evidence does not constitute a denial of due process unless the opposing party establishes bad faith on the government's part. (See *People v. Duff* (2014) 58 Cal.4th 527, 549.)

---

**17** We necessarily reject the Company's argument that evidence obtained from the inspection should have been suppressed.

* See footnote, *ante*, page 1.

In essence, the Company argues the documents in the original inspection file that could not be recovered at all (i.e., Forms 1, 1A, and 1AY and Davila's handwritten investigative notes) or in their entirety (i.e., Forms 1B, 1BX, and 1BY) may have shown the absence of consent and cast doubt on the veracity of Davila's account. (See *People v. Fauber* (1992) 2 Cal.4th 792, 830.) However, while "discrepanc[ies] . . . might eventually prove useful . . . in impeaching a witness[,] . . . [it] is not the type of evidence that a reasonable [official] should be expected to recognize as having apparent exculpatory value." (*People v. Pastor Cruz* (1993) 16 Cal.App.4th 322, 325.) Since the best that can be said of the unpreserved documents is that they were potentially useful,[18] the Company must establish bad faith. In the instant case, the record shows the original inspection file had been stolen from Hami's car and Cal/OSHA attempted to recreate the file. The Appeals Board could reasonably conclude there was "no evidence of official animus toward [the Company] . . . or any conscious effort . . . to suppress exculpatory evidence." (*People v. Angeles* (1985) 172 Cal.App.3d 1203, 1214.) At most, the record demonstrates the original file was stolen by a third party, "not purposefully destroyed or secreted [by the government] so as to prejudice [the opposing party] with respect to their possible content." (*Ibid.*)

We also reject any notion the stolen inspection file somehow prevented the Company from preparing and presenting a defense to the citations. Prior to the hearing, the Company received a copy of the reconstituted inspection file. While the reconstituted file was incomplete, the documents still provided relevant information, including the identity of the other officials present at the inspection. At the hearing, the Company examined John, Ernie, and Emerzian and cross-examined Davila and Hami.

---

[18] However, we point out John's own testimony revealed he consented to the inspection. (See *ante*, at p. 8.)

d. *Substantial evidence demonstrated the violations underlying Citations 3 through 6 were properly classified as "serious."*[19, *]

"There shall be a rebuttable presumption that a 'serious violation' exists in a place of employment if [Cal/OSHA] demonstrates that there is a realistic possibility that death or serious physical harm could result from the actual hazard created by the violation." (Lab. Code, § 6432, subd. (a).) " 'Serious physical harm' . . . means any injury or illness, specific or cumulative, occurring in the place of employment or in connection with any employment, that results in any of the following:  [¶]  (1) Inpatient hospitalization for purposes other than medical observation.  [¶]  (2) The loss of any member of the body. [¶]  (3) Any serious degree of permanent disfigurement.  [¶]  (4) Impairment sufficient to cause a part of the body or the function of an organ to become permanently and significantly reduced in efficiency on or off the job, including, but not limited to, depending on the severity, second-degree or worse burns, crushing injuries including internal injuries even though skin surface may be intact, respiratory illnesses, or broken bones." (*Id.*, subd. (e).)  While " 'realistic possibility' is not defined in the Labor Code or safety orders" (*In the Matter of the Appeal of Levy Premium Foodservice Limited Partnership DBA Levy Restaurants*, OSHAB 12-R1D5-2714 & 2715, Denial of Petition for Reconsideration (Aug. 25, 2014) [2014 WL 11706517]), the Appeals Board "has interpreted the phrase . . . to mean a prediction that is within the bounds of human reason, and not pure speculation" (*In the Matter of the Appeal of Ekedal Concrete, Inc.*, OSHAB 13-R3D1-0131, 0132 & 0133, Decision After Reconsideration (Mar. 28, 2016) [2016 WL 1536060]).  (Cf. *County of Orange v. Santa Margarita Water Dist.* (1996) 44

---

**19**     In its opening brief, the Company presented arguments regarding the classification of two other citations.  In its reply brief, it "acknowledge[d] [these] arguments . . . were mistakenly made, as those matters have been resolved."

*     See footnote, *ante*, page 1.

Cal.App.4th 189, 192 ["When a statute does not define its operative words, 'courts should give to the words . . . their ordinary, everyday meaning. . . .' "].)

"A [Cal/OSHA] safety engineer or industrial hygienist who can demonstrate, at the time of the hearing, that his or her division-mandated training is current shall be deemed competent to offer testimony to establish each element of a serious violation, and may offer evidence on the custom and practice of injury and illness prevention in the workplace that is relevant to the issue of whether the violation is a serious violation." (Lab. Code, § 6432, subd. (g).) Here, Davila, a safety engineer whose division-mandated training was current at the time of the hearing, testified there were realistic possibilities of death or serious physical harm resulting from the violations underlying Citations 3 through 6. (See *ante*, at pp. 6-8.) Thus, Cal/OSHA established the presumption.

"If [Cal/OSHA] establishes a presumption pursuant to [Labor Code section 6432,] subdivision (a) that a violation is serious, the employer may rebut the presumption and establish that a violation is not serious by demonstrating that the employer did not know and could not, with the exercise of reasonable diligence, have known of the presence of the violation. The employer may accomplish this by demonstrating both of the following: [¶] (1) The employer took all the steps a reasonable and responsible employer in like circumstances should be expected to take, before the violation occurred, to anticipate and prevent the violation, taking into consideration the severity of the harm that could be expected to occur and the likelihood of that harm occurring in connection with the work activity during which the violation occurred. Factors relevant to this determination include, but are not limited to, those listed in subdivision (b).[20] [¶]

---

**20** The factors enumerated in Labor Code section 6432, subdivision (b)(1) are "(A) Training for employees and supervisors relevant to preventing employee exposure to the hazard or to similar hazards," "(B) Procedures for discovering, controlling access to, and correcting the hazard or similar hazards," "(C) Supervision of employees exposed or potentially exposed to the hazard," "(D) Procedures for communicating to employees about the employer's health and safety rules and programs," "(E) Information that the

28.

(2) The employer took effective action to eliminate employee exposure to the hazard created by the violation as soon as the violation was discovered." (Lab. Code, § 6432, subd. (c).) Nothing in the record shows the Company satisfied these prongs.

**DISPOSITION**

The superior court's September 8, 2017 order denying Nolte Sheet Metal, Inc.'s petition for a writ of administrative mandamus is affirmed. Costs are awarded to respondent Occupational Safety and Health Appeals Board and real party in interest Department of Industrial Relations, Division of Occupational Safety and Health.

_____

DETJEN, J.

I CONCUR:

_____

SMITH, J.

---

employer wishes to provide, at any time before citations are issued, including, any of the following: [¶] (i) The employer's explanation of the circumstances surrounding the alleged violative events. [¶] (ii) Why the employer believes a serious violation does not exist. [¶] (iii) Why the employer believes its actions related to the alleged violative events were reasonable and responsible so as to rebut, pursuant to subdivision (c), any presumption established pursuant to subdivision (a)."

**Poochigian, Acting P.J., concurring.**

*Consent to Search*

The rule that "warrantless searches are generally unreasonable … applies to commercial premises as well as homes." (*Marshall v. Barlow's, Inc.* (1978) 436 U.S. 307, 311.) Unless one of a few carefully defined exceptions applies,[1] government inspectors must obtain a warrant before inspecting a business for safety hazards and regulatory compliance. (See generally *ibid*.)

Consent is a well-recognized exception to the warrant requirement. In order to be valid, consent must not be the product of coercion. (*Bumper v. North Carolina* (1968) 391 U.S. 543, 550.) "[W]here the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority. [Citations.]" (*Florida v. Royer* (1983) 460 U.S. 491, 497.) In other words, the government must show the "manifestation of consent was the product of … free will and not a mere submission to an express or implied assertion of authority. [Citation.]" (*People v. James* (1977) 19 Cal.3d 99, 106.)

In determining whether consent was voluntary, courts consider a variety of factors, including whether officers have their guns drawn when consent is requested or given, whether the person was told they have a right to refuse consent to the search, and whether the person was told a search warrant could be obtained. (*People v. Ramirez* (1997) 59 Cal.App.4th 1548, 1558.)

Here, seven government officials from four government entities confronted the son of Nolte Sheet Metal's owner. Two or three of the officials were armed and donned bulletproof vests. One of them told John he was there "to do a compliance inspection"

---

[1] There does not seem to be any dispute between the parties that consent was required here.

and requested to "g[e]t started." John, one of only two employees onsite, responded, "Well, I guess."

We are tasked with looking to what a "typical reasonable person" would have "understood by th[is] exchange." (See *Florida v. Jimeno* (1991) 500 U.S. 248, 251.) I believe that, given the circumstances, a reasonable person could have understood the official's statement to mean that the "compliance inspection" he was there "to do" was going to happen, and John was merely being asked to get started as a rhetorical courtesy. The presence of several government officials, including several who were armed, reinforced the implication that an immediate inspection was inevitable. Indeed, the circumstances were such that John actually believed he did not "really" have the option of declining consent. Moreover, there is no evidence the officers advised John of his right to decline consent.**²** I do not think the "typical reasonable person" in John's position would have understood that they were completely free to reject the government's request to inspect the premises for violations of the law.**³**

*Shows of Force During Routine Administrative Inspections*

Law enforcement officers commonly carry firearms for their safety. Well-trained law enforcement officials routinely perform duties that place them at great risk as they guard us from criminal activity. A safe, grateful society depends upon their service and valor in protecting the public. But asking for consent while armed can have a coercive effect – especially in the context of a routine safety inspection of a business.

---

**²** An advisement of the right to refuse consent is not always required to obtain valid consent (*People v. Boyer* (2006) 38 Cal.4th 412, 447, fn. 20), but its absence is a factor in determining whether consent was freely given. (*People v. Ramirez*, *supra*, 59 Cal.App.4th at p. 1558.)

**³** However, the finder-of-fact concluded otherwise, and we are tasked only with reviewing that finding for substantial evidence.

2

The threat of coercion is why courts look to whether officers have their guns drawn when consent is requested.  (*People v. Ramirez*, *supra*, 59 Cal.App.4th at p. 1558.) This is not because the law is indifferent to officer safety or disapproves the use of firearms by law enforcement.  Rather, the law recognizes that displays of police power can be very intimidating even – maybe especially – to law-abiding members of the public.

Here, there were apparently more government officials than employees on the premises, and several of the officials were armed. It is unclear what specific role, if any, was played by the armed officials other than being present during the inspection.  Even assuming the presence of firearms and bulletproof vests was somehow justified, their coercive effect cannot be ignored.[4]  Of course, the display of force by law enforcement is just one of several factors bearing on consent.  And not every display of force will negate consent.  But here there were few mitigating factors, if any.  There is no indication the Nolte Sheet Metal employees were told they have a right to refuse consent to the search, or that a search warrant could be obtained.  (*People v. Ramirez*, *supra*, 59 Cal.App.4th at p. 1558.)  If there is justification for administrative officials to carry firearms for routine workplace inspections, they should mitigate their coercive effect by informing the owners of their constitutional right to freely grant or refuse consent to search private property.

Administrative safety inspections and similar entries onto private property are supposed to be "quite different from an entry by police officers with guns drawn." (*People v. Ovieda* (2019) 7 Cal.5th 1034, 1052.)  However, this case, and others like it, demonstrate how some administrative inspections have come close to overstepping what was once a distant boundary limiting acceptable displays of force.  Unless there is some

---

**4** The record apparently does not reflect a justification or rationale for the show of force, nor whether such was a standard practice for the government's conducting safety inspections at business premises.

3

elusive rationale to the contrary, the deployment of armed officials for routine workplace inspections should not become commonplace. It would seem prudent for administrative agencies, and perhaps the Legislature, to review such practices – in the interest of public safety and our free society.

*Administrative Due Process*

Additionally, I have concerns with whether the present administrative scheme affords due process. "Any relevant evidence shall be admitted if it is the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs, *regardless of the existence of any common law or statutory rule which might make improper the admission of such evidence over objection in civil actions*." (8 Cal. Code Regs., tit. 8, § 376.2, italics added.) Accordingly, the Appeals Board may consider otherwise inadmissible hearsay evidence, so long as the evidence is not deemed "sufficient in itself" to support a finding. (*Ibid*.) Thus, small business owners have to defend against the threat of substantial punitive fines with far fewer evidentiary protections than it would have in a civil suit.

Perhaps the abrogation of these important evidentiary safeguards would comport with due process if subsequent judicial review was de novo. Instead, the opposite is true. "The findings and conclusions of the appeals board on questions of fact are conclusive and are not subject to review. Such questions of fact shall include ultimate facts and the findings and conclusions of the appeals board." (Lab. Code, § 6630.) At no point in this lengthy and consequential legal process does any Article VI court act as the finder-of-fact.

*Conclusion*

Notwithstanding these observations, given the Supreme Court's holding in cases like *Tex-Cal Land Management, Inc. v. Agricultural Labor Relations Bd.* (1979) 24

4

Cal.3d 335, I am compelled to concur in the judgment, rather than dissent.  (See *id.* at p. 346; see generally *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450.)


_____
POOCHIGIAN, Acting P.J.